UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

JERRY L. LEWIS,

        Plaintiff,

    v.                              Case No. 16-cv-1092-pp

ROBERT A. MCDONALD,
*Secretary of Veterans Affairs,*
*United States Department of Veterans Affairs,*

        Defendant.

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DKT. NO. 12) AND DISMISSING CASE

The defendant reinstated the plaintiff to his former position after the plaintiff prevailed on a 2009 EEO retaliation claim. The plaintiff now alleges that, on his return to work, his two supervisors and a co-worker "took calculated actions against him" because he had named them as the officials responsible for his unlawful termination in 2009. Dkt. No. 16 at 2. While the plaintiff describes their actions as a "vicious regime of retaliation," id., the defendant asserts that the plaintiff cannot show that he suffered a materially adverse employment action. The plaintiff transferred to a different department in April 2015, and remains employed by the defendant today. Because the court has not identified a genuine dispute regarding an issue of material fact, the court will grant the defendant's motion for summary judgment and dismiss the case.

## I.  Jurisdiction

The plaintiff alleges retaliation under Title VII of the Civil Rights Act of 1964. The Act's jurisdictional provision empowers federal courts to adjudicate civil cases "brought under" Title VII. §2000e–5(f)(3). Title VII cases also fall under the grant of subject-matter jurisdiction to federal courts over cases "arising under" federal law. 28 U.S.C. §1331.

## II.  Facts

The defendant employed the plaintiff as a cook in the Nutrition and Food Service Department beginning in December 2008. Dkt. No. 15-1 at 14-15. In that position, the plaintiff received "all the frozen products and the produce products that came into the facility for the kitchen." Dkt. No. 15-2 at 4.

John Schmidt and Jean Wroblewski supervised the plaintiff. Dkt. No. 15-1 at 14. Wroblewski acted as the plaintiff's second-line supervisor from the start of his employment in 2008 through 2009, and again after he returned in December 2013. Dkt. Nos. 18 at ¶3; 18-2 at 7. Schmidt worked as the agency's chief of food production, and was the plaintiff's first-line supervisor during the same period as Wroblewski. Dkt. Nos. 18 at ¶3; 18-2 at 8, 10; 15-1 at 180.

On September 25, 2009, based on a recommendation from Schmidt, Wroblewski requested that the plaintiff's employment be terminated. Dkt. Nos. 18 at ¶4; 18-3 at 13. The defendant terminated him at that time. Dkt. No. 15-1 at 14.

In 2009, the plaintiff filed an EEO complaint with the defendant's Office of Resolution Management, alleging: (1) discrimination based on race, age and

reprisal and (2) hostile work environment. Dkt. No. 1 at ¶¶5, 8. The administrative law judge issued an order entering judgment in favor of the plaintiff on the reprisal claim only, and ruled that the plaintiff had established that he was terminated because of his "protected EEO activity." Dkt. Nos. 15-1 at 15; 18 at ¶4; 18-3 at 17. The ALJ's September 30, 2013 order required the defendant to provide the plaintiff with a "six-month training period," assign a "mentor mutually agreed to by the parties" and meet weekly to discuss his job performance and progress. Dkt. Nos. 18 at ¶4; 18-3 at 17.

The defendant reinstated the plaintiff to the same position, and the plaintiff returned to work in December 2013. Dkt. No. 15-1 at 16. The plaintiff's supervisors (Schmidt and Wroblewski) did not change. Dkt. No. 15-1 at 14-16. He remains employed by the defendant today, but transferred to another department in April of 2015. Dkt. No. 15-1 at 61-62.

In this case, the plaintiff sued under Title VII "to correct unlawful employment practices on the basis of reprisal and to provide appropriate relief to plaintiff who was adversely affected by such practices." Dkt. No. 1. He alleges the following acts of retaliation:

> Unwarranted counseling, refusing to pay Lewis on regularly scheduled payroll dates, altering Lewis's work schedule and later reprimanding him for working the altered work schedule, refusing to pay Lewis the appropriate pay rate, refusing to provide Lewis with a locker upon his return to work, Wroblewski directing Lewis's coworkers to monitor Lewis's whereabouts, Schmidt treating Lewis differently than all other employees by requiring a witness to be present at all meetings between Schmidt and Lewis, management directing Lewis's coworker Jason Borgwardt to document Lewis's day to day workload, reprimanding Lewis for not signing in and out when leaving the floor when Lewis had in fact signed in and out, subjecting Lewis to unwarranted scrutiny when he had to use the

restroom, and requiring Lewis to sign a 60-day review when he was not a probationary employee.

Dkt. No. 1 at ¶11.

A.    Unwarranted Counseling

The complaint's reference to "unwarranted counseling" refers to a time in the second week of January 2014; Schmidt had ordered too many food products even though the plaintiff had provided him with a completed order form, and Schmidt accused the plaintiff of a disorganized kitchen. Dkt. Nos. 15-3 at 4; 15-4 at 26. The plaintiff explained that Schmidt made the freezer look disorganized by ordering too much food. Dkt. No. 15-2 at 13. The plaintiff told the EEO investigator under oath that he believed Schmidt adjusted the food order because Schmidt did not trust the plaintiff's judgment. Dkt. No. 15-2 at 18. This happened once. Dkt. No. 15-4 at 26-27. The plaintiff admits that he never was disciplined in connection with the "unwarranted counseling" allegation. Dkt. Nos. 15-1 at 79; 17 at ¶17. During the EEO investigation and hearing, however, the plaintiff stated that Schmidt's telling him that the freezer needed to be organized made him stressed, fearful and nervous. Dkt. Nos. 15-2 at 21; 15-1 at 31.

B.    Refusing to Pay the Plaintiff on Regularly Scheduled Payroll Dates

The plaintiff alleges that the defendant refused to pay him "on regularly scheduled payroll dates," referring to December 20, 2013, when he did not receive a paycheck. Dkt. No. 15-3 at 4. The plaintiff returned to work on December 2, 2013, trained for three days, then took medical leave from December 5, 2013 to January 6, 2014. Dkt. Nos. 15-1 at 75; 15-4 at 22-23. On

December 31, 2013, while he was on medical leave, the plaintiff filed a complaint of reprisal because he did not receive his first paycheck. Dkt. No. 15-1 at 75-76. Schmidt had no control over payroll, and neither Schmidt nor Wroblewski were involved with the delayed payment. Dkt. Nos. 15-5 at 14-15; 15-2 at 32-33. The defendant resolved the delayed payment issue, and the plaintiff received the one missing payment in February 2014. Dkt. Nos. 15-2 at 28; 15-1 at 21. Nevertheless, the plaintiff felt that the delayed payment incident was disrespectful and manipulative; he told the EEO investigator under oath and testified that he experienced stress from its occurrence near Christmas because, during his medical leave, he could not take his family on a planned vacation to the Wisconsin Dells and had to get a payday loan. Dkt. Nos. 15-1 at 22; 15-2 at 30-31, 43. There is no dispute that the plaintiff blames the delayed payment incident on the defendant generally, and not on any particular individual. Dkt. Nos. 15-2 at 32-33, 64; 15-1 at 75, 79.

C. Altering Plaintiff's Work Schedule and Later Reprimanding Him for Working the Altered Work Schedule

The plaintiff alleges that during January 2014, Schmidt changed the plaintiff's "tour of duty schedule" to 6:00 a.m. to 2:30 p.m., but later accused him of leaving early when he left at 2:30 p.m. Dkt. Nos. 15-3 at 4; 15-4 at 30.

One afternoon in January 2014, Schmidt directed the plaintiff to come to work at 6:00 a.m. the following day, to cover the shift of a coworker who was scheduled to work 6:00 a.m. to 2:30 p.m. (the plaintiff normally worked the 6:30 a.m. to 3:00 p.m. shift). Dkt. No. 15-2 at 33. The plaintiff agreed, and worked from 6:00 a.m. to 2:30 p.m. that day. Id. The next day, Schmidt called

a meeting with the plaintiff and a union steward, and threatened the plaintiff with disciplinary action for leaving "early" at 2:30 p.m. Id. Schmidt "was telling [the plaintiff] that [he] left work early, and [he] should look at the schedule and follow the schedule verbatim . . . [and] that this could be a discipline thing if [the plaintiff left early], and they will have to investigate it." Dkt. Nos. 15-2 at 33-34; 15-5 at 17. Schmidt explained that "since [the plaintiff] was just back for a week, we decided to give him the benefit of the doubt." Dkt. No. 15-5 at 15.

The plaintiff testified at his deposition that he believed that reprimand meant the same thing as counseling because counseling is the first step in the termination process. Dkt. No. 15-4 at 30-31 ("Well, the way the VA or any government agency I have worked for is, counseling, a verbal warning, and then a write-up, and then after a write-up it can lead up to termination. So in all actuality, when they pulled me in there, that was the first stage of a discipline procedure by questioning that I changed my schedule."). Schmidt testified that "counseling" was "a little meeting to see what happened," which the employees of the defendant call a "Weingarten." Dkt. Nos. 15-4 at 30-31; 15-5 at 15-17. Even accepting the plaintiff's version of the facts as true, the plaintiff does not dispute that he did not receive a letter, suspension or termination. Dkt. No. 15-4 at 30-32.

With respect to how this incident affected him, the plaintiff testified in the EEO hearing as follows:

Q    So what did you do after you leave [sic] Mr. Schmidt's office on that day?

A   I called Will Johnson in the EEO office, and I told Mr. Johnson, I said that this is too much. I cannot -- I'm not sleeping, I can't concentrate, I cannot work under these conditions. It just -- it was just horrible, and I said the guy told me to come in early, then he's trying to write me up. I said -- and I asked him, I says is there any way possible, you know. I will go shovel snow. Please take me away from these people.

Dkt. No. 15-1 at 33-34.

D.    Refusing to Pay the Plaintiff at the Appropriate Pay Rate

The plaintiff alleges that the defendant refused to pay him at the appropriate pay rate, referring to the fact that on January 3, 2014, he received a partial amount of his salary. Dkt. Nos. 15-3 at 4; 15-4 at 33. On that date, the plaintiff received "about $1.50 less an hour" than he should have been paid on his return to work. Dkt. No. 15-2 at 44. Schmidt and Wroblewski had no involvement with the pay rate issue. Dkt. Nos. 15-2 at 49; 15-5 at 19-20. The plaintiff received the full amount owed to him after the defendant resolved the issue in or around March 2014 (approximately four months after the plaintiff's start date). Dkt. Nos. 15-2 at 44; 15-1 at 81. In his deposition, the plaintiff expressed frustration in trying to deal with the defendant, and testified that his wife "was a little nervous" about paying bills. Dkt. Nos. 15-2 at 44-45, 48; 15-2 at 44-45, 47-48. The plaintiff also testified in the EEO hearing that he "felt like they [the defendant] just had a grudge or vendetta" against him. Dkt. No. 15-1 at 26. The plaintiff told the EEO investigator under oath that he holds the defendant—not the individuals—responsible for the incorrect pay rate. Dkt. Nos. 15-1 at 26-27, 91; 15-2 at 49.

7

E.     Refusing to Provide a Locker

On the plaintiff's first day back on the floor after training (January 8, 2014), Schmidt allegedly failed to provide him with a locker in which to store his personal belongings. Dkt. Nos. 15-2 at 51; 15-3 at 4; 15-4 at 38. The plaintiff asked Schmidt for a locker to hold personal items, and Schmidt told him to request the locker from facility/building management. Ex. 15-2 at 51. There is no evidence in the record that anyone other than facility/building management assigns lockers to employees. Dkt. No. 15-5 at 22-23. The man in facility/building management told the plaintiff that he did not have any lockers available. Dkt. No. 15-2 at 51.

Schmidt offered to let the plaintiff change into his uniform and store his belongings in the manager's office, but the plaintiff declined. Dkt. No. 15-2 at 51-52. Schmidt's office is a "four-desk cubicle office" with "windows [that] are wide open." Dkt. No. 15-1 at 95. Schmidt told the plaintiff that he could wear his uniform into work, which the plaintiff understood to be a violation of the Safe Serve policy (not the defendant's policy)[1] for sanitation reasons. Dkt. No. 15-1 at 94. Schmidt got a little angry when the plaintiff declined, because Schmidt was "throwing out all these ideas and [the plaintiff] was shooting them all down." Schmidt testified that he told the plaintiff, "you need to come to work in your uniform. I don't care what happens before that, but you need to do

---

[1] The plaintiff testified in the EEO hearing that Safe Serve are the "people who certifies [sic] in reference to sanitation," but that he was not aware of any policy that the defendant has prohibiting him from wearing his uniform home. Dkt. No. 15-1 at 94.

something to come to work in your uniform." Dkt. No. 15-1 at 181-182.
Schmidt confirmed that it is "unusual" for him to "get loud with the
employees." Dkt. No. 15-1 at 182.

The plaintiff testified that "within the day" that same day or the next day
"they" provided him with a locker. Dkt. Nos. 15-4 at 41; 15-1 at 96. After
receiving his locker, the plaintiff learned that facility/building management was
conducting an audit of lockers. Dkt. No. 15-1 at 92. The plaintiff testified in his
deposition that the man in facility/building management was rude, while
admitting that the man did not know him and that the man was "just an angry
person." Dkt. Nos. 15-2 at 51; 15-1 at 93. The plaintiff testified in the EEO
hearing that this incident caused him anxiety, stress, and fear. Dkt. No. 15-1
at 41.

F.    Wroblewski Directing the Plaintiff's Coworkers to Monitor Him

The plaintiff alleges that on January 14, 2014, Wroblewski told the
plaintiff's coworkers to monitor the plaintiff's location. Dkt. Nos. 15-3 at 4; 15-
4 at 42-43. The plaintiff testified in his deposition that coworker Latoya Dixon
told him that Wroblewski had told her to monitor the plaintiff, and that Dixon
and other tray line supervisors all were monitoring his whereabouts. Dkt. Nos.
15-2 at 66, 67; 15-1 at 43, 97; 15-4 at 42-45; 17 at ¶61. The plaintiff testified
that he did not feel it was necessary to find out why he was being monitored,
because "this was just something they do in our unit." Dkt. No. 15-2 at 66. The
plaintiff admits that the defendant never disciplined him with respect to this
allegation of monitoring. Dkt. Nos. 15-4 at 47; 17 at ¶64.

Dixon testified that Wroblewski never asked her to monitor the plaintiff, that no one told her they were monitoring the plaintiff and that she did not monitor the plaintiff. Dkt. No. 15-6 at 9. She explained in her deposition that she was not given any reason as to why "they" were monitoring the plaintiff, but that she had her own beliefs that Wroblewski wanted the plaintiff out of there because he had filed a lawsuit. Dkt. No. 15-6 at 10. Dixon testified that:

> [n]obody told me. It was just those gestures. And like I said, she didn't -- Jean didn't tell me that and no one specifically told me that, but they -- you know, like -- at that time I remember this going on, as far as what time did he go out on his break or whatnot, like you know? And I'm like -- I wasn't involved with that, you know? I wouldn't have did that. But that is what was going on at that time.

Dkt. No. 15-6 at 9-10.

G.   <u>Schmidt Treating the Plaintiff Differently Than All Other Employees by Requiring a Witness to be Present at All Meetings Between Schmidt and the Plaintiff</u>

The plaintiff alleges that on January 14, 2014, Schmidt refused to meet with him unless a witness was present. Dkt. Nos. 15-3 at 4; 15-4 at 48. The plaintiff had requested administrative leave; Schmidt called him over to discuss the request, then "told [him] that [Schmidt] cannot have a conversation with [him] without a witness." Dkt. No. 15-2 at 69. Schmidt testified during the EEO hearing that he required a witness to be present when he met with the plaintiff because the plaintiff had included things in the prior EEO complaint that Schmidt did not say. Dkt. No. 15-1 at 199. Schmidt also testified that he "never had any other employees" accuse him of saying things he never said, so he felt that he needed protection. <u>Id.</u>

10

At the January 14, 2014 meeting with the two witnesses, Schmidt told the plaintiff that his request for administrative leave had been denied. Dkt. No. 15-2 at 70. The plaintiff testified in the EEO hearing, and told the investigator under oath, that that the situation caused him stress and anxiety, and that it was "hard to work in that kind of environment," an environment in which he felt like a misfit. Dkt. Nos. 15-2 at 71-72; 15-1 at 44-45.

H.     Management Directing Plaintiff's Coworker Jason Borgwardt to Document Plaintiff's Day-To-Day Workload

Various co-workers told the plaintiff that Wroblewski had instructed the plaintiff's coworker, Jason Borgwardt, to document the plaintiff's day-to-day workload. Dkt. Nos. 15-2 at 72; 15-1 at 47, 51; 15-4 at 49-50. Borgwardt (the plaintiff's coworker, not a supervisor) worked for the defendant as a cook from 2007 through the end of 2014 or early 2015. Dkt. No. 15-7 at 5, 6. In his prior EEO complaint, the plaintiff alleged that Borgwardt (and two other cooks) harassed him verbally, intentionally misplaced tools and utensils necessary for the job, intentionally mislabeled or failed to label food, and did other things. Dkt. Nos. 18 at ¶2; 18-1 at 7, 11.

Borgwardt testified in the EEO hearing that he was recording complaints, at Wroblewski's direction, for the purposes of retraining the plaintiff:

Q      Did Jean ever tell you to do anything with respect to [the plaintiff]?
A      In respect to [the plaintiff], there were multiple complaints coming at her from multiple people on a regular basis, so I was instructed to notify the cooks if there are any incidents where [the plaintiff] was negligent in what his responsibilities are, to let me know.
Q      Let who know? To let you know?

11

A Yes. To let me know, and I would write all of them down on the areas that she thought he needed to be retrained.

Q So what was the purpose of the cooks telling you what [the plaintiff's] areas of -- what his problem areas were?

A The purpose was for her to identify what areas he needed to be retrained in.

Dkt. No. 15-1 at 148-149.

Q I just want to clarify, John, that when people were told to document [the plaintiff's] -- whatever problems he was having –

A Uh-huh.

Q -- it wasn't in a punitive matter, Jean said it was to retrain him?

A Yes.

Dkt. No. 15-1 at 194-195.

Similarly, in his deposition, Borgwardt testified as follows:

Q . . . It's my understanding during this meeting with Miss Wroblewski she asked you to bring any complaints about [the plaintiff's] performance to her so then they can -- or she can engage retraining; is that correct?

A Yes.

Dkt. No. 15-7 at 8.

Q During that time, are you aware of any retraining that [the plaintiff] would have received pursuant to the complaints that were submitted to Miss Wroblewski?

A Yes.

Q What are you aware of in terms of training?

A To the best of my knowledge, he had been retrained with Ronaldo Garrett and to the best of my knowledge he was also retrained with Marvin Moore.

Q Do you know on which tasks he was retrained?

A All of the tasks pertaining to the freezer position.

Q So complete retraining?

A Correct. From storage to stocking, to distribution.

Dkt. No. 15-7 at 19.

For approximately thirty days, Borgwardt obtained only negative information from the plaintiff's coworkers about the plaintiff's performance. Dkt. No. 15-7 at 10, 11. A number of the plaintiff's coworkers provided positive information, but Borgwardt did not include the positive information in his handwritten notes to Wroblewski. Id. Borgwardt testified that "positive data was not obtained or collected for anyone because it's assumed that you're going to have positive behavior in the workplace because that's what you were hired to do." Dkt. No. 15-7 at 11. Borgwardt testified in his deposition that he provided Wroblewski with handwritten notes containing negative information about the plaintiff on five or six occasions, and included his own personal negative information. Dkt. Nos. 15-7 at 10-12; 15-1 at 149, 157.

Because the plaintiff believed that Wroblewski had instructed Borgwardt to collect this information, the plaintiff worked in fear "all the time," and felt anger, stress and nervousness. Dkt No. 15-1 at 48-50. The plaintiff complained to the defendant's HR Department regarding Wroblewski having Borgwardt solicit negative information about his performance from his coworkers, informed the HR Department as to how this conduct adversely affected him, and asked for a transfer to another department. Dkt. No. 15-1 at 48. The defendant never followed up with the plaintiff on his complaint or his request for a transfer. Id.

Borgwardt testified in his deposition that he discussed Wroblewski's directive with Schmidt, and that Schmidt disagreed with Wroblewski's directive. Dkt. No. 15-7 at 10. In the EEO hearing, Schmidt initially indicated

13

that he did not have knowledge of Wroblewski's directive to Borgwardt directing him to obtain negative information about the plaintiff's performance from the plaintiff's coworkers, and that he did not recall speaking with Borgwardt regarding such a directive. Dkt. No. 15-1 at 182, 191. In that same testimony, however, Schmidt remembered that Borgwardt came in and "said something about it," and that Wroblewski said in a meeting that she told "them to write down any mistakes [the plaintiff] was making and then [they'd] retrain him on it." Id. at 191-192.

Wroblewski testified that she recalled receiving only one possible issue involving the plaintiff (raised by Borgwardt), and admitted that this particular issue may have occurred prior to the plaintiff's unlawful termination in 2009. Dkt. Nos. 18 at ¶3; 18-2 at 36, 42, 44. She did not recall receiving any complaints from the plaintiff's coworkers after the plaintiff's reinstatement in December 2013. Dkt. Nos. 18 at ¶3; 18-2 at 13-14. She also testified that she never asked, instructed or directed Borgwardt to obtain information of any kind from the plaintiff's coworkers concerning his performance. Dkt. Nos. 18 at ¶3; 18-2 at 12, 15-16. Wroblewski did not recall receiving any written notes from Borgwardt regarding the plaintiff's performance. Dkt. Nos. 18 at ¶3, 18-2 at 13. She added that it was not a routine job responsibility for one worker to obtain information about a coworker's performance from that person's coworkers. Id.

Meanwhile, Borgwardt approached Desiree Howard, who worked as a cook alongside the plaintiff after he was reinstated in December 2013. Dkt. No. 15-1 at 118-119. Borgwardt asked Howard if there were things that the

14

plaintiff did not do, such as items that he did not pull. Id. at 120. Howard

testified that she was surprised that Borgwardt would be asking for this

information because it was "not his position" to do so. Dkt. No. 15-1 at 121.

Howard confirmed to Borgwardt that the plaintiff had done everything he was

supposed to do; that she had nothing negative to report. Dkt. No. 15-1 at 120.

Howard informed the plaintiff of Borgwardt's solicitation of negative

information, and told him to "be careful." Dkt. No. 15-1 at 122. Borgwardt

asked Howard only about the plaintiff and not any other employee. Dkt. No.

15-1 at 125.

Another co-worker, Prentiss Johnson, worked as a cook in December

2013. Dkt. No. 15-1 at 128-130. On several occasions, Borgwardt stated to

Johnson that the plaintiff never should have gotten his job back, and that the

plaintiff had "worked the system." Dkt. No. 15-1 at 133. In the EEO hearing,

Johnson testified that Borgwardt asked Johnson to provide negative

information concerning the plaintiff's performance. Dkt. No. at 131-132.

Borgwardt did not ask for positive information or even general information

about the plaintiff's performance or any other employee. Dkt. No. 15-1 at 132.

Schmidt confirmed that the plaintiff complained "a lot" to him and to his

assistant, Michael Lynch, and that the plaintiff believed Borgwardt was

creating a hostile work environment for him by soliciting negative information

about him from his coworkers. Dkt. No. 15-1 at 191-193. Schmidt was aware

that the plaintiff "believed he was working in a hostile work environment." Dkt.

No. 15-1 at 192. Schmidt and Michael Lynch received the plaintiff's complaint

15

of "hostile work environment" and Schmidt "just let it drop." Dkt. No. 15-1 at 192-194.

I.    Reprimanding the Plaintiff For Not Signing In and Out When Leaving the Floor

The plaintiff's "signing-in-and-out" allegation refers his court-ordered, weekly participation in a mentoring program upon his return to work. Dkt. No. 15-1 at 53. Whenever employees left the department for reasons other than breaks or lunch—such as attending the mentoring program—they were required to sign out with the time they left, and sign in when they returned. Id. On one occasion in February 2014, Schmidt told the plaintiff that he was required to sign out and in when attending the mentoring program. Id. at 53-54; Dkt. No. 15-4 at 51-52. The plaintiff felt that it was inappropriate for Schmidt to tell him that he "was required to sign in and out when [he] leave[s] the department" to see his mentor, without first checking the sign-out sheet to see if he'd done so. Dkt. No. 15-1 at 102. The plaintiff testified that it was "like living a nightmare. Stress, anxiety, fear, lack of focus." Id. at 53. The plaintiff was not disciplined with respect to this allegation. Dkt. No. 15-1 at 183.

J.    Signing In and Out for Using the Bathroom

The plaintiff testified during the EEO hearing that he did not feel that Schmidt was retaliating against him when Schmidt asked if he was signing in and out, but he did feel it was retaliation when Schmidt asked on one occasion if the plaintiff went to the bathroom. Dkt. No. 15-1 at 101. The plaintiff was not disciplined for being in the bathroom. Dkt. Nos. 15-1 at 106; 15-5 at 36.

During the EEO hearing, the plaintiff testified that he was not aware that Schmidt asked any other co-workers about using the restroom. Dkt. No. 15-1 at 54. Schmidt demanded that the plaintiff sign in and out any time he left the department, despite acknowledging that employees are not required to sign in/out when using the bathroom. Dkt. No. 15-1 at 54-55. Specifically, the plaintiff testified as follows:

> Q: Let's just get this clear. Did John tell you that you needed to sign in and out to go to the bathroom?
> A: No, ma'am, he did not.
> Q: Once you told John you went to the bathroom, what did he say?
> A: He didn't say anything.

Dkt. No. 15-1 at 105-106.

Schmidt testified in his deposition that he did not pursue the issue after the plaintiff told him he was in the bathroom:

> Q   Explain what happened here, if you know.
> A   I just came back -- I don't remember if this is what he's talking about. One time I came back to talk to him, and he wasn't around. And he was gone probably 15, 20 minutes. And I just said, hey, I needed to talk to you, where were you. And he told me he went to the bathroom. That was the end of the whole discussion.
> Q   So, in other words, you didn't ask him did you go to the restroom?
> A   No. I asked him where he was. He said he went to the bathroom. Right now our bathrooms we have a bathroom in the area, and they're being redone. So it is quite a walk to go to the bathroom right now. So I don't really question people that much about it. I just asked him where he was, and he said he went to the bathroom, and that was the end of it.
> . . .
> Q   So therefore as far as the Complainant's explanation, you were satisfied where he was at that particular time?
> A   Correct.

Dkt. No. 15-5 at 34-36.

K.    Requiring the Plaintiff  to Sign a 60-Day Review

The plaintiff asserts that in February 2014, he was forced to sign a sixty-day performance review, even though he was not a probationary employee. Dkt. Nos. 15-3 at 5; 15-4 at 56. The administrative law judge had ordered, as part of his reinstatement, that the plaintiff be retrained. Dkt. Nos. 15-1 at 107; 15-5 at 37-38. Sixty days after the plaintiff returned to his position, he was given a performance review that addressed his progression in the job. Dkt. No. 15-1 at 107. The plaintiff knew that he was not on probation. Dkt. Nos. 15-1 at 58, 106; 15-5 at 38. The plaintiff testified, however, that he felt like they were trying to intimidate him because he was not a probationary employee. Dkt. No. 15-1 at 106. It is undisputed that every employee who changes jobs or is promoted must complete the sixty-day performance review. Dkt. Nos. 15-5 at 38; 17 at ¶94. It also is undisputed that the plaintiff was not disciplined with respect to his performance review, and that his performance review was good. Dkt. Nos. 15-1 at 185; 15-4 at 59; Dkt. No. 17 at ¶¶95, 96.

L.    All Allegations

With respect to each of the eleven alleged unlawful employment practices, the plaintiff testified in the EEO hearing and during the EEO investigation that he felt: stressed, nervous/anxious, a lack of focus at work, concerned about write ups or discipline, fear, anger, aggravation, badgered and discomfort. Dkt. Nos. 15-2 at 34-35, 40, 68-69, 76, 83, 86, 88, 90-91; 15-1 at 44, 50-51, 54, 56, 60-61. He described the environment as "hostile," "horrible,"

and a "nightmare," and said that he could not work under those conditions.

Dkt. No. 15-1 at 33, 56, 191–194.

Schmidt testified in the EEO hearing that he never disciplined the plaintiff or threatened him with discipline following the plaintiff's reinstatement in December of 2013:

> Q    Have you disciplined [the plaintiff] for anything since he's returned to work at the VA?
> A    No.
> Q    Have you threatened him with discipline?
> A    No.
> Q    If [the plaintiff] said that you did threaten him with discipline, how would you respond to that?
> A    Yeah, I didn't.
> Q    Okay.
> A    That's not true.

Dkt. No. 15-1 at 186-187. In April of 2015, the plaintiff obtained a transfer to the Logistics Department as a Program Support Specialist. Dkt. No. 15-4 at 16-17.

### III.    ANALYSIS

A.    <u>Summary Judgment Standard</u>

Rule 56 of the Federal Rules of Civil Procedure allows a court to grant summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those "facts that might affect the outcome of the suit[,]" and a dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party [.]" <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

When considering a motion for summary judgment, a court "construe[s] all factual disputes and draw[s] all reasonable inferences in favor of the nonmoving party." Golla v. Office of the Chief Judge of Cook Cty., Ill., 875 F.3d 404, 407 (7th Cir. 2017) (citing Cole v. Bd. of Trs. of N. Ill. Univ., 838 F.3d 888, 895 (7th Cir. 2016)). The courts "'favor toward the nonmoving party does not extend to drawing inferences that are supported by only speculation or conjecture.'" Monroe v. Ind. Dep't of Transp., 871 F.3d 495, 503 (7th Cir. 2017) (quoting Argyropoulos v. City of Alton, 539 F.3d 724, 732 (7th Cir. 2008)). "Summary judgment is not a time to be coy: conclusory statements not grounded in specific facts are not enough to stave off summary judgment." King v. Ford Motor Company, 872 F.3d 833, 840 (7th Cir. 2017) (internal quotations and citations omitted).

At this stage, the court's task is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249. While it is inappropriate for the court to evaluate witness credibility, Springer v. Durflinger, 518 F.3d 479, 484 (7th Cir. 2008), a court appropriately grants summary judgment "if [plaintiff] cannot present sufficient evidence to create a dispute of material fact regarding any essential element of [his] legal claims on which [he] bears the burden of proof." Burton v. Bd. of Regents of Univ. of Wis. Sys., 851 F.3d 690, 694 (7th Cir. 2017) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).

B.    Title VII Retaliation

The plaintiff has framed his claims as Title VII retaliation. Dkt. No. 16 at 1. Title VII "prohibits discriminating against an employee 'because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.'" 42 U.S.C. § 2000e–3(a). A retaliation claim requires proof that the plaintiff suffered an adverse employment action because of [his] statutorily protected activity." Lord v. High Voltage Software, Inc., 839 F.3d 556, 563 (7th Cir. 2016). To prevail, the plaintiff must prove that (1) he engaged in an activity protected by the statute; (2) he suffered an adverse employment action; and (3) there is a causal link between the protected activity and the adverse action. Id.

Over the years, case law in this circuit has described two methods of proving employment discrimination—a "direct" method, and an "indirect" method. The term "indirect method" usually refers to the burden-shifting framework created by McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Tomanovich v. City of Indianapolis, 457 F.3d 656, 663 (7th Cir. 2006). Courts, including the Seventh Circuit itself, had held that the "direct method" required a plaintiff to present direct evidence of: (1) a statutorily protected activity; (2) an adverse action taken by the employer; and (3) a causal connection between the two. Sitar v. Indiana Dept. of Transp., 344 F.3d 720, 728 (7th Cir. 2003), citing Stone v. City of Indianapolis Pub. Util. Div., 281 F.3d 640, 644 (7th Cir. 2002). The Seventh Circuit has described "direct" evidence as "smoking gun" evidence.

See, *e.g.*, McCoy v. WGN Continental Broadcasting Co., 957 F.2d 368, 372 (7th Cir. 1992).

Under the McDonnell Douglas framework—which courts had referred to as the "indirect method" of proving discrimination—a plaintiff had to show that (1) he engaged in a statutorily protected activity; (2) he performed his job according to his employer's legitimate expectations; (3) despite performing the job to the employer's expectations, he suffered an adverse employment action; and (4) he was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. Sitar, 344 F.3d at 728. If the plaintiff established these elements under McDonnell Douglas, the burden shifted to the employer to present evidence of a non-discriminatory reason for its employment action. Adusumilli v. City of Chicago, 164 F.3d 353, 362 (7th Cir. 1998). If the employer met that burden, the burden shifted back to the plaintiff to demonstrate that the employer's reason was pretextual. Sitar, 344 F.3d at 728.

In 1994, the Seventh Circuit discussed the fact that an employer's admission of discriminatory intent was direct evidence of discrimination, speculating that such an admission "may be the only truly direct evidence of intent that will ever be available." Troupe v. May Dep't Stores Co., 20 F.3d 734, 736 (7th Cir. 1994). But the court acknowledged that circumstantial evidence also was admissible to "provide a basis for drawing an inference of intentional discrimination." Id. The court identified three types of circumstantial evidence:

> . . . suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the

protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn.

\* \* \* \* \* \*

. . . evidence, whether or not rigorously statistical, that employees similarly situated to the plaintiff other than in the characteristic (pregnancy, sex, race, or whatever) on which an employer is forbidden to base a difference in treatment received systematically better treatment.

\* \* \* \* \* \*

. . . evidence that the plaintiff was qualified for the job in question but passed over in favor of (or replaced by) a person not having the forbidden characteristic and that the employer's stated reason for the different in treatment is unworthy of belief, a mere pretext for discrimination.

Id. (citations omitted).

The Troupe court described the first kind of circumstantial evidence as "ambiguous statements, suspicious timing, discrimination against other employees, and other pieces of evidence none conclusive in itself but together composing a convincing mosaic of discrimination against the plaintiff." Id. at 737. In the years that followed the Troupe decision, the Seventh Circuit and many other courts repeated the "convincing mosaic" phrase in numerous decisions when describing the kind of circumstantial evidence that could constitute direct evidence of discrimination. See, e.g., Hatcher v. Bd. of Trustees of Southern Illinois University, 829 F.3d 531, 540 (7th Cir. 2016); Chaib v. Indiana, 744 F.3d 974, 982 (7th Cir. 2014); Cloe v. Indianapolis, 712 F.3d 1171, 1180 (7th Cir. 2013).

On August 19, 2016, after twenty-two years of decisions using the language, the Seventh Circuit announced that "convincing mosaic" was not a

legal test, and it overruled prior cases "to the extent that they rely on 'convincing mosaic' as a governing legal standard." Ortiz v. Werner Enterprises, 834 F.3d 760, 764 (7th Cir. 2016). The court explained that in Troupe, it had used the phrase "convincing mosaic" "as a metaphor that was designed to displace the unhelpful direct and indirect methods rather than add to them." Id. The court conceded that the metaphor had not been successful, id., and clearly stated that, "[f]rom now on, any decision of a district court that treats [the phrase 'convincing mosaic'] as a legal requirement in an employment-discrimination case is subject to summary reversal . . . ." Id. at 765.

The Ortiz court stated that the correct legal standard "is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." Id. The court instructed district courts to consider evidence "as a whole, rather than asking whether any particular piece of evidence proves the case by itself—or whether just the 'direct' evidence does so, or the 'indirect' evidence. Evidence is evidence." Id. The court held that "district courts must stop separating 'direct' from 'indirect' evidence and proceeding as if they were subject to different legal standards." Id.

The Ortiz court made a specific point of clarification with regard to the burden-shifting test of McDonnell Douglas, which the court noted was sometimes referred to as "an 'indirect' means of proving employment discrimination." Id. at 766, citing McDonnell Douglas Corp., 411 U.S. at 792. The Seventh Circuit specified that its decision in Ortiz did not "concern

24

McDonnell Douglas or any other burden-shifting framework, no matter what it is called as a shorthand." Id. Instead, the court said, it was concerned "about the proposition that evidence must be sorted into different piles, labeled 'direct' and 'indirect,' that are evaluated differently." Id. The Ortiz court held that "all evidence belongs in a single pile and must be evaluated as a whole," and concluded that that conclusion was "consistent with McDonnell Douglas and its successors." Id.

In this case, then, it is the court's job to determine whether there is a genuine dispute as to an issue of material fact regarding whether a reasonable factfinder could conclude that the defendant discriminated against the plaintiff, and that it would not have done so if he had not filed his 2009 EEO complaint. There is no "smoking gun" admission from the defendant that the agency intentionally discriminated against the defendant, so the court must look at the evidence as a whole.

### 1.    Statutorily Protected Activity

There is no dispute that the plaintiff engaged in statutorily protected activity when he filed an EEO complaint with the defendant's Office of Resolution Management in 2009. Formal charges "with the EEOC constitute statutorily protected expression." Walls v. Turano Baking Co., 221 F. Supp. 2d 924, 931 (N.D. Ill. 2002).

### 2.    Adverse Employment Action

A retaliation claim requires proof that the plaintiff suffered an adverse employment action because of his statutorily protected activity. High Voltage

25

Software, Inc., 839 F.3d at 563. A materially adverse action "need not be one that affects the terms and conditions of employment but must be 'one that a reasonable employee would find to be materially adverse such that the employee would be dissuaded from engaging in the protected activity.'" Poullard v. McDonald, 829 F.3d 844, 856 (7th Cir. 2016), quoting Roney v. Illinois Dep't of Transportation, 474 F.3d 455, 461 (7th Cir. 2007).

Materially adverse employment actions do not include threats of disciplinary action and discipline that are never carried out. Poullard, 829 F.3d at 856 ("While we do not doubt that the possibility of discipline can be stressful, we have previously held that this kind of threat is not enough to support a claim for retaliation."). Similarly, the anti-retaliation provision does not "protect against petty slights, minor annoyances, [or] bad manners." Id.; see also Boss v. Castro, 816 F.3d 910, 918 (7th Cir. 2016). That is because the anti-retaliation provision "protects an individual not from all retaliation, but from retaliation that produces an injury or harm." Id. (quoting Burlington Northern & Santa Fe Railway Co. v. White, 548 U.S. at 68 (2006); see also Stephens v. Erickson, 569 F.3d 779, 790 (7th Cir. 2009)). Title VII "does not set forth 'a general civility code for the American workplace.'" Burlington Northern & Santa Fe Railway Co., 548 U.S. at 68 (quoting Oncale v. Sundowner Offshore Servs. Inc., 523 U.S. 75, 80 (1998)). Put another way, "not everything that makes an employee unhappy is an actionable adverse action." Wilson v. Brennan, 2018 WL 636012, *2 (7th Cir. Jan. 31, 2018) (quoting Lapka v. Chertoff, 517 F.3d 974, 986 (7th Cir. 2008)).

Given that, the plaintiff has an uphill climb to prove that any of the incidents he has alleged constituted an adverse employment action. The eleven incidents cited into the complaint fall into one of three categories: (1) incidents involving action or inaction by the defendant agency; (2) incidents involving Schmidt; and (3) incidents involving Wroblewski and/or other co-workers.

a.   *Incidents of Action/Inaction by the Defendant Agency*

Three incidents fall into the first category—the delayed paycheck, the short paycheck (which the plaintiff refers to as "rate of pay") and the fact that there was not a locker immediately available to the plaintiff upon his return to work. The plaintiff does not allege, and has not shown, that Schmidt or Wroblewski (the individuals whom he believes had reason to retaliate against him) had any involvement in any of these three incidents. Dkt. No. 21 at ¶¶26, 45.

Rather, the evidence establishes that the plaintiff's first paycheck after his reinstatement was temporarily delayed. The plaintiff returned to work on December 2, 2013. He was at work only three days before going on medical leave from December 5, 2013 to January 6, 2014; during that medical leave, the plaintiff filed a complaint because he did not receive his first paycheck (which was due him while he was on leave). Dkt. No. 21 at ¶23. The defendant explained that the missing paycheck was an administrative error, dkt. nos. 15-1 at 18-20, and the plaintiff received the paycheck without further incident. Dkt. No. 21 at ¶46.

With regard to the short paycheck that the plaintiff received on January 3, 2014, dkt. nos. 15-3 at 4; 15-4 at 33, which was "about $1.50 less an hour" than the amount the plaintiff should have received, dkt. no. 15-2 at 44: There is no dispute that the plaintiff received the full amount owed to him after the defendant resolved the  issue in or around March 2014 (approximately four months after the plaintiff's start date). Dkt. Nos. 15-2 at 44; 15-1 at 80. There is no evidence that this was anything other than an accounting error, and it was resolved.

With regard to the locker: on the plaintiff's first day back to work after retraining in January, an unidentified person in facility/building management told him that there were no lockers available, but he received a locker "within the day." Dkt. No. 15-4 at 41.

None of these incidents rise to the level of a materially adverse employment action. Even if they did, there is nothing in the record that shows a causal connection between these administrative errors and the fact that the plaintiff had filed an EEO complaint four years earlier.

> b.    *Incidents Involving Schmidt*

Neither do any of the incidents in the second category amount to materially adverse employment actions. On one occasion (January 28, 2014), Schmidt told the plaintiff that the freezer needed to be more organized. Dkt. No. 21 at ¶¶12, 13, 15. On another occasion, Schmidt told the plaintiff to come in early. After the plaintiff (appropriately) left early (because he'd started early, as

requested), Schmidt told him that management would have to investigate. Dkt. No. 21 at ¶¶33-36.

Perhaps in these two situations, the plaintiff might argue that he met the second prong of the McDonnell framework—that he performed his job according to his employer's legitimate expectations. But even if that is true, a plaintiff still must show that despite performing to expectations, he suffered an adverse employment action. The plaintiff admits that the EEO manager told him that Schmidt and the others subsequently decided that they had made a mistake, and that they took no further action involving either incident. Dkt. No. 15-2 at 34-35. Schmidt explained in his deposition testimony that management gave the plaintiff the benefit of the doubt, because the plaintiff had been back only a week. Dkt. No. 15-5 at 15. At most, the plaintiff suffered (understandable) frustration at being unfairly accused of leaving early. This frustration does not constitute an adverse employment action.

The plaintiff also points to Schmidt's insistence that a witness be present when Schmidt met with the plaintiff to deny him any further administrative leave. The plaintiff refers to the fourth prong of the McDonnell Douglas test, arguing that he wasn't aware of any other employees upon whom Schmidt placed this requirement. It is not clear to the court how a supervisor requiring a witness to be present during conversations with an employee constitutes an adverse employment action against the employee. It may be a bit embarrassing. It may be inconvenient. But it is not the kind of materially adverse action that would chill the plaintiff from exercising his rights.

Even assuming for the purposes of this motion that having witnesses present when one talks to one's supervisor constitutes an "adverse employment action," and that other employees weren't subject to a similar requirement, the McDonnell Douglas test would shift the burden to the defendant to show a non-discriminatory reason for having witnesses present. Schmidt testified that the only reason that he required a witness to be present when he met with the plaintiff was because, in bringing the EEOC 2009 complaint, the plaintiff had claimed Schmidt said things that Schmidt denies having said. In other words, having been accused of inappropriate behavior, Schmidt had a witness present to protect himself from allegedly false allegations—not to punish, or to discriminate against, the plaintiff. That is a non-discriminatory reason for having a witness present. Given that, under McDonnell Douglas, the burden shifts back to the plaintiff to demonstrate that Schmidt's reason was pretextual; the plaintiff has not met that burden. The plaintiff has not refuted Schmidt's explanation that Schmidt wanted a witness present because the plaintiff previously had said things about Schmidt that were not true.

With respect to Schmidt requiring the plaintiff to sign in and out, or the sixty-day performance review, the plaintiff has not shown that these incidents rise to the level of a materially adverse employment action. As far as the court can tell, the plaintiff's complaint with regard to Schmidt is not that Schmidt required him to sign in and out when he left the floor; the plaintiff appears to concede that this was company policy. Rather, the plaintiff argues that, on one occasion in February, Schmidt reminded the plaintiff that he had to sign out

and in for mentoring, without first checking the sheet to determine whether the plaintiff had been doing so. Like other incidents, it appears that this was an isolated occasion, and while it likely was frustrating to the plaintiff, it does not constitute an adverse employment action.

On another occasion, Schmidt asked the plaintiff where he had been, and the plaintiff explained that he had been in the bathroom. Dkt. No. 15-5 at 36. While the plaintiff alleges that this was retaliatory—he argues that there is no requirement that employees sign out/in when they leave the floor to go to the bathroom—he concedes that Schmidt took no action against him, and that nothing further happened with respect that incident. A supervisor who has been looking for an employee without success asking that employee where he'd been is not an adverse employment action.

As for the performance review, the plaintiff argues that, because he was not a "probationary employee"—because he was rehired as a regular employee—the defendant should not have treated him like one by requiring him to sign a sixty-day review. But the record establishes that every employee who changes jobs or is promoted has to complete the sixty-day review (albeit sometimes after six months), and that the plaintiff's review was positive. Dkt. No. 21 at ¶¶88, 89, 94-96. In addition, the administrative law judge assigned to the plaintiff's 2009 case ordered that the plaintiff participate in retraining and mentoring. The Seventh Circuit has held that a plaintiff has not suffered an adverse action even where her employer placed her on an improvement plan and threatened her with termination if she failed to sign it. Cole v. Illinois, 562

F.3d 812, 816-817 (7th Cir. 2009). The situation here was less extreme, and the fact that the plaintiff may have felt offended at having to undergo a review did not constitute an adverse employment action.

c. *Incidents Involving Wroblewski*

The two remaining incidents involve Wroblewski, who may have told someone to monitor the plaintiff's whereabouts and/or instructed Jason Borgwardt to document the plaintiff's day-to-day workload. The allegation of monitoring comes from the testimony of co-worker Latoya Dixon, who testified that she believed the defendants were out to get the plaintiff for his prior lawsuit because they had previously discriminated against her on the basis of race. Dkt. No. 15-6 at 10. Dixon acknowledged that Wroblewski never asked her to monitor the plaintiff, that she (Dixon) never monitored him, and that she never witnessed anyone writing up the plaintiff. Dkt. Nos. 21 at ¶63; 15-6 at 8-9. The plaintiff himself admitted that he did not ask Dixon why "they" were monitoring him because it was "something they did in our unit." Dkt. No. 15-2 at 66. Nothing else occurred with respect to this incident. Even accepting the facts in the light most favorable to the plaintiff, the court cannot find that a co-worker's opinion that someone was monitoring the plaintiff's whereabouts constituted an adverse employment action by the defendant. There is no evidence of actual monitoring, or evidence that anyone instructed anyone to monitor the plaintiff's whereabouts.

The final allegation arises from co-defendant Jason Borgwardt's testimony that on one occasion (two to three months after the plaintiff's

reinstatement), Wroblewski directed Borgwardt to collect and pass on negative information about the plaintiff's work performance. Dkt. No. 15-7 at 7-8. The plaintiff asserts that only Borgwardt and Wroblewski were present during this alleged discussion, and that the two never again discussed Wroblewski's directive. Dkt. No. 16 at 4. In his deposition, Borgwardt explained why he was approached by Wroblewski:

> There was a steady flow of complaints regarding Mr. Lewis's performance, or lack thereof, flowing into her office. I believe I entered her office on that day, and my complaint, quite possibly, was the straw that broke the camel's back. And upon that complaint is when she had said, If anyone has a complaint, write it down and give it to me and we'll work on what he needs to be retrained on. So it was basically just be wedging between the complaint and her."

Dkt. No. 15-7 at 8. Based on this conversation, Borgwardt testified that he told his coworkers, "[p]er Jean's request, if anybody has an issue or complaint, please write it down, give it to me, and I will give them to her because she doesn't want the traffic in her office." Dkt. No. 15-7 at 9. Borgwardt claimed that he solicited feedback for thirty days, and left handwritten notes for Wroblewski on her desk, including his own negative feedback. Borgwardt testified in his deposition he stopped collecting feedback when Schmidt told him that it was not a good idea to do so. Dkt. No. 15-7 at 10.

There is conflicting testimony with respect to this allegation. Wroblewski denies instructing Borgwardt to collect negative information, and denies receiving any notes from him. Dkt. Nos. 18 at ¶3, 18-2 at 12-13, 15. She testified that she was aware of only one issue involving the plaintiff. Id., Dkt. No. 18-2 at 13-14. Schmidt testified in his deposition that he never spoke to

Borgwardt about Wroblewski's instructions, but also testified (in the October 14, 2015, EEO hearing) that he told Borgwardt to stop. Two of the plaintiff's coworkers, Desiree Howard and Prentiss Johnson, testified that Borgwardt approached them to gather information about the plaintiff. Howard told Borgwardt that the plaintiff did everything required of him. Dkt. Nos. 21 at PPF ¶¶37, 40; 15-1 at 120.

Taking the evidence in the light most favorable to the plaintiff, as the court must at this stage of the proceedings, the record shows that Wroblewski instructed Borgwardt to collect negative information about the plaintiff and Borgwardt collected the information for thirty days, but that Wroblewski did nothing with it. To the extent that Schmidt knew of the monitoring, he instructed Borgwardt to stop once he learned of it.

This is the one allegation the plaintiff makes that involves an extended period where he was treated differently than other employees. He alleges that it was very stressful to him to know that employees who'd discriminated against him during his last tenure at the agency were collecting negative information about him after his return. But the Seventh Circuit has held that "it is well established that unfulfilled threats that result in no material harm cannot be considered an adverse employment action under Title VII." Hottenroth v. Vill. of Slinger, 388 F.3d 1015, 1030 (7th Cir. 2004) (citing Ajayi v. Aramark Bus. Servs., Inc., 336 F.3d 520, 531 (7th Cir. 2003)). The facts in the record show, at most, an implicit threat, which is not enough to constitute an adverse employment action under Seventh Circuit law.

Under any view of the facts, the evidence shows that Borgwardt did not like the plaintiff. In his 2009 EEO complaint, the plaintiff had asserted that Borgwardt verbally harassed him, intentionally misplaced tools and utensils necessary for his job, and intentionally mislabeled or did not label food items. Dkt. No. 18-1 at 12, 45-46, 50-52. Borgwardt had said that the plaintiff had worked the system. Dkt. No. 15-7 at 35-36. But the plaintiff concedes that Borgwardt, a co-worker, had no authority over him. Dkt. Nos. 16 at 3; 21 at ¶70, PPF ¶13. As for Schmidt and Wroblewski, the evidence suggests—and it may well have been the case—that they were not fans of the plaintiff's, and would have welcomed signs of failure. But they did not take adverse employment actions against him.

It is important to note that the plaintiff has not made a hostile work environment claim. Courts have recognized that a plaintiff may bring a discrimination claim under Title VII for being subjected to a hostile work environment. Plaintiffs bring such claims when they are subjected to harassment on the basis of race which is so severe or pervasive that "a reasonable person would find [the environment] hostile or abusive, and one that the victim in fact did perceive to be so." Smith v. Northeastern Illinois University, 388 F.3d 559, 566 (7th Cir. 2004) (quoting Cerros v. Steel Technologies, Inc., 288 F.3d 1040, 1045 (7th Cir. 2002); other citations omitted). The question the court must consider on summary judgment is not whether, taken as a whole, the various instances of action or inaction the plaintiff has alleged created an environment that was hostile or abusive. The

court has before it only the question of whether the undisputed evidence, taken in the light most favorable to the plaintiff, shows that he was subjected to any adverse employment actions. It does not.

3.    Causal Link Between Protected Expression and Adverse Employment Action

Because the court finds that, viewed as a whole, the evidence does not show that the plaintiff suffered any adverse employment actions, the court need not reach the third element of a retaliation claim—the requirement that the plaintiff must prove a causal link between the protected activity and the adverse employment action. But even if the court had found adverse actions, the evidence does not demonstrate the required causal link.

To establish a causal link, a plaintiff must demonstrate that the defendant "would not have taken the adverse . . . action but for [his] protected activity." Baines v. Walgreen Co., 863 F.3d 656, 661 (7th Cir. 2017). Put another way, a plaintiff "only ha[s] to establish 'that the protected activity and the adverse action were not wholly unrelated.'" Hunt-Golliday v. Metro. Water Reclamation Dist. of Greater Chi., 104 F.3d 1004, 1014 (7th Cir. 1997).

As explained above, the plaintiff has no evidence that either Schmidt or Wroblewski—the individuals whom he believes had reason to retaliate against him—had anything to do with the first category of administrative mistakes, and he does not hold them responsible. Dkt. Nos. 15-2 at 32-33, 64; 15-1 at 76, 80; 21 at ¶¶25, 26, 31, 48. Accordingly, it is impossible for the plaintiff to establish a causal link between his filing of the 2009 EEOC complaint and those incidents. With regard to all of the other allegations, except Schmidt requiring a

witness to be present, the plaintiff *assumes* that because Schmidt and Wroblewsi's actions made him uncomfortable, or stressed, or embarrassed, those actions must have been the result of his filing his 2009 EEOC complaint. That assumption is not enough to establish a causal link, even when one looks at all of the evidence as a whole, as the <u>Ortiz</u> court instructed. And with regard to Schmidt's requiring a witness to be present during one conversation, there is a causal connection, but no adverse employment action.

### 4. Similarly Situated Employees

Under the <u>McDonnell Douglas</u> burden shifting framework, the plaintiff must be able to identify a similarly situated employee who did not engage in protected activity and was treated more favorably that the plaintiff. That employee must be "directly comparable" to the plaintiff in "all material respects." <u>Alexander v. Casino Queen, Inc.</u>, 739 F.3d 972, 981 (7th Cir. 2014) (quoting <u>Abuelyaman v. Ill. State Univ.</u>, 667 F.3d 800, 810 (7th Cir. 2011)). While the plaintiff responds that "similarly situated employees received their paychecks on time," lockers were immediately available when a new supervisor started in mid-January, "no one else has ever been monitored as he was in the workplace," and that he was the only non-probationary employee who had to complete the sixty-day probationary review, he never identifies these individuals or shows how they were similarly situated in any relevant respects. See <u>Arizanovska v. Wal–Mart Stores, Inc.</u>, 682 F.3d 698, 703 (7th Cir. 2012) ("The similarly-situated inquiry is a flexible, common-sense one, but it at least requires that the plaintiff name a comparator outside her protected class."). In

the absence of any comparators, the plaintiff cannot make a *prima facie* case. Carothers v. Cty. of Cook, 808 F.3d 1140, 1152 (7th Cir. 2015) (holding that the plaintiff waived the analysis where she did not identify similarly situated co-workers who did not engage in protected activity).

5. Legitimate Non-discriminatory Business Purpose

Finally, if the court assumes for the sake of argument that the plaintiff had established a *prima facie* case of retaliation, the defendant responded with evidence that it had a legitimate, nondiscriminatory reason for its actions. O'Leary v. Accretive Health, Inc., 657 F.3d 625, 635 (7th Cir. 2011). Nothing in the record suggests that the defendant's explanations—administrative mistakes with payroll and the locker, Schmidt's enquiring as to the plaintiff's whereabouts when he'd been gone for a bit, Schmidt's protecting himself from being accused of saying things he did not say, the uniform requirement or performance reviews—were pretextual. Dkt. Nos. 15-1 at 19-20; 15-5 at 14-15. The plaintiff's speculation that these things must have happened out of retaliation, and the unsupported opinions or beliefs of his coworkers, do not establish pretext. Hall v. City of Chi ., 713 F.3d 325, 333 (7th Cir. 2013); McDonald v. Vill. of Winnetka, 371 F.3d 992, 1001 (7th Cir. 2004) ("Inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion.").

## IV.    CONCLUSION

Viewing the record as a whole, the court finds that the plaintiff has failed to identify a genuine dispute as to an issue of material fact, and that as a matter of law, the defendant is entitled to judgment.

The court **GRANTS** defendant's motion for summary judgment. Dkt. No. 12.

The court **ORDERS** that the case is **DISMISSED**. The clerk shall enter judgment accordingly.

Dated in Milwaukee, Wisconsin this 28th day of February, 2018.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**United States District Judge**